YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY v. WILLIAM
A. SHELBY.

[48 South. 403.]

RAILROADS. *Conductor of relief train. Person seeking passage. Assault and battery. Master and servant. Scope of employment.*

A railroad company is responsible for an unjustifiable assault and battery committed by its conductor in charge of a relief train upon a person who got aboard of it seeking permission to ride to a wreck in order to assist his mother, a passenger on the wrecked train, where the wrongful acts were parts of the conductor's efforts to cause the person assaulted to alight from the train.

FROM the circuit court of, first district, Bolivar county.
HON. SYDNEY SMITH, Judge.

Shelby, appellee, was plaintiff in the court below; the railroad company, appellant, was defendant there. From a judgment in plaintiff's favor the defendant appealed to the supreme court.

Plaintiff, being advised that his mother would arrive on a designated passenger train on defendant's railroad, went to the depot at Rosedale in time to meet the train on which his mother was expected, and shortly after arriving at the depot saw the smoke of the approaching train some distance below the town. The train stopped before coming in sight of the depot and remained stationary for such a length of time that plaintiff suspected a wreck, became uneasy and started to walk down the track towards the train. He met the fireman in the lower end of the railroad yard, learned that the train had been wrecked, but

was not informed whether or not any one was hurt, the fireman being himself unadvised. Plaintiff immediately returned to the depot, where he learned that the defendant was preparing to send an engine with a coal car attached to the aid of the passenger train. He asked the fireman if he could go on the engine to the wrecked passenger train. The fireman refused to allow him to do so, explaining that he had no authority, but suggested that appellee ask the conductor, who was on the coal car attached in front of the engine. Plaintiff walked down to the coal car, and, not being able to see the conductor, climbed up on the ladder attached to the side of the car until he reached a position where he could see the conductor. He asked him if he could go down to the wreck with him, and, according to plaintiff's testimony, the conductor replied: "No, get down off there." Plaintiff then explained that he did not want to go through curiosity, but that his mother was on the train, and he wanted to go to her assistance, to which the conductor replied: "I don't give a damn what you want to go for. Get off there!" The conductor approached plaintiff and plaintiff then said, "You need not be so damned insulting," whereupon the conductor struck him in the face, on the ear and on top of the head, continuing to strike until plaintiff jumped off the car. The conductor was not operating the train for public use or for the transportation of passengers, and it was against the company's rules to allow persons to ride on it, as it was a relief train going to the assistance of a derailed passenger train. The defendant's testimony tended to show that plaintiff was the aggressor in his controversy with the conductor.

On the point as to whether the conductor was engaged in his master's business, the court instructed the jury as follows:

"No. 5. The court instructs the jury that they cannot find against the railroad company in this case unless they believe from the evidence that the conductor was engaged in and about the business of the railroad company and acting within the scope of his authority at the time he struck the plaintiff.

"No. 6 The court instructs the jury that if they believe from the evidence that the conductor struck the plaintiff because of insulting words used to the said conductor by the said plaintiff, or to protect himself from an attack on him by the said plaintiff, then in that event the defendant is not liable to respond in damages, and they will find for the defendant."

"No. 8. The court instructs the jury that the railroad company in this case is not liable further and other than a private citizen would be in a like case of its agents and servants, and that the same rule would apply to a suit as between two individuals as applies in the present suit.

"No. 9. The court instructs the jury that, in determining whether the act in question in any case was done within the scope of employment, the question to be considered is whether the act was done as a means or for the purpose of performing the work of the master, and the court instructs the jury that in such case the inquiry is not whether the act in question in any case was done, so far as time is concerned, while the servant is engaged in the master's business, nor as to the mode or manner of doing it, nor whether in doing the act he used the appliances of the master, but whether from the nature of the act itself it is actually done, or was an act done in the master's business or wholly disconnected therefrom by the servant, not as a servant, but as an individual on his own account, and the court instructs the jury that, if they believe the said servant was acting as an individual and on his own account when he struck the plaintiff, then and in that event they will find for the defendant.

"No. 10. The court instructs the jury that if they believe from the evidence that the blow given the plaintiff in this case grew out of a private difficulty between the plaintiff and the conductor, and that at the time the said conductor struck the plaintiff he was acting as an individual in resenting an insulting remark made to him or in protecting himself from an attack of the said plaintiff, then and in that event they will find for the defendant."

"No. 13. The court intructs the jury that if they believe from the evidence that the conductor in this case was acting for his own personal purposes, independent and separate from the duty he owed to the defendant company, then and in that event the company is not liable, and they will find for the defendant.

"No. 14. The court instructs the jury that the railroad employes, as well as other men, whether engaged in their duties as employes of the company or otherwise, have the same right that other citizens of the community have to resent an unprovoked insult, and to exercise the right of self-defense."

*Charles N. Burch* and *C. L. Sivley,* for appellant.

Upon the facts presented by this record, we think this case is controlled entirely by the case of *Cassedy v. Pullman Co.* (Miss.) 17 South. 373.

The facts in that case were as follows: Mr. Cassedy was a passenger on one of the regular Illinois Central trains which had attached to it a Pullman car, and which constituted a part of the train. This Pullman car carried refreshments and drinks for the purpose of being sold to the passengers on the train, and to any person who might apply for them. Cassedy desired to purchase some beer, and he testified that the Pullman Car company was habitually engaged in the sale of such drinks on its cars, and he entered the car for the purpose of engaging in business and patronizing the Pullman company by buying beer from it. He found the steward in charge of the buffet, and after making the application to him, without excuse or any sort of justification, the stewart threatened Cassedy with great personal violence and assaulted him with a huge knife, a deadly weapon. The assault was so aggravated that Cassedy thought that his life was in danger. The testimony further showed that the insult and assault on Cassedy was unprovoked.

After the introduction of the testimony, the trial court gave a peremptory instruction, and upon appeal to the supreme court,

speaking through Chief Justice COOPER, this honorable court held as follows:—

"The appellant did not belong to the class of persons (passengers in the car of appellee) who had a right to deal with the steward of the car as the agent and servant of the company. Technically, appellant was a trespasser, and the purpose of his trespass was to induce the steward to violate the instructions of his master, as well as the law, by making sale of liquors forbidden to be sold even to passengers on the sleeping car. For any indignity or affront offered to him by the steward the company was not, under the circumstances, liable."

In view of the foregoing authority, when applied to the evidence presented by this record, we confidently assert that the assault complained of was not inflicted for the purpose of putting this man off the train, nor was Kigler at the time of assaulting Shelby, performing any duty on behalf of the railroad company.

We conclude this discussion with the following quotation from Elliott on Railroads, vol. 3 (2d ed.) § 1265, p. 636:

"If any employe steps aside from the line of his duty and commits an independent tort on his own account and outside of the scope of his employment, the master is not liable therefor."

This text is fully sustained by the long list of authorities, including the Mississippi court, which appear in note 176.

Shelby, at the time of the difficulty between him and Kigler, was a clear trespasser on the company's car in the yards at Rosedale. Of course, we are not unmindful of the general duty of railroad companies to strangers at their stations. We do not, therefore, deny that Mr. Shelby had a right to come to the station to meet his mother and the railroad company was due him the duty to exercise reasonable care to keep the station house and platform in reasonably safe condition, so that he would not be injured thereby. This principle of law is very clearly defined in Elliott on Railroads, *supra,* section 1256.

But we contend, and earnestly urge, that this assault upon Shelby did not occur·at the station while he was waiting at the proper place provided for Mr. Shelby, to wit, the depot and waiting-room. When, therefore, he left this place and went down in the railroad yard and climbed upon this coal car, he then became a trespasser upon the railroad's property. He was at a place where he had no right to be, and dealing with employes of the company who were not employed to transact business with him.

On the proposition of what constitutes a trespasser, we cite the following authorities: Elliott on Railroads, *supra,* sec. 1252; *Illinois, etc., R. Co. v. Latham,* 72 Miss. 32, 16 South. 757; *Cassedy v. Pullman Co.,* 17 South. 373; *Livingston v. Alabama, etc., R. Co.,* 84 Miss. 1, 36 South. 256.

In the *Cassedy case, supra,* the court used the following language:—

"Technically, appellant was a trespasser, and the purpose of his trespass was to induce the steward to violate the instructions of his master, as well as the law, by making sale of liquors forbidden to be sold, even to passengers on the sleeping car."

The case at bar is identical with that of the *Cassedy* case because Shelby was at a place where he had no right to be and was engaged in attempting to induce employes of the company to violate its rules.

We cannot see the difference between a man attempting to practice a fraud upon the railroad company in colluding with the employes to allow him to ride upon the trains for less than the proper fare, and the case as presented by this record where the trespasser was prevailing upon the employe to violate the rules of the company.

This court has repeatedly held in the cases of Latham, McAfee, Harris and Williams, *supra,* when the party is engaged in such fraud, that no matter what indignity is offered him by the employe of the company, the company is not responsible.

Cassedy had no right in the Pullman car; Shelby had no right

upon the coal car.  Cassedy was trying to get the steward to violate the rules of the Pullman company; Shelby was endeavoring to induce the employes to violate the rules of the railroad company.  Both of them were trespassers and engaged in attempting to deal with the two companies under circumstances where they were not invited, nor were they expected under the law, to deal with the matter.  Both were, therefore, under no contractual obligations with the companies, but merely endeavoring to induce the employes to violate positive rules.  Under such conditions, the court in the *Cassedy case* concludes as follows:

"For any indignity or affront offered to him by the steward, the company was not as to him, under the circumstances, liable."

Shelby was, therefore, a trespasser, and when he became involved in the difficulty with the employes of the railroad company he was not in any sense transacting business with the railroad.  The facts were well understood by Shelby, and when therefore, he was at a place where he had no right to be, engaged in a personal difficulty which could have easily been avoided by him, he should congratulate himself that he received only a very mild thrashing, and certainly ought not attempt to reap vengeance upon the railroad company when it was not under any obligation of contract or invitation, dealing with him.

The mere fact that a man is employed by a railroad company does not deny him the right to resent an insult when occasion offers nor to defend himself against an assault.  So many suits of this nature have been instituted of late that it has had a tendency to create the impression that when a man is employed by a corporation that he is therefore put up as a target for insults of the grossest nature, and yet, if he dares to resent it, he renders his master liable.

The fact that Shelby had served four years as sheriff of Bolivar county did not warrant the employe of the company in violating the rules, nor did it require a great deal of courage on the part of Shelby to curse this employe of the railroad and involve

him in a personal difficulty and then get full satisfaction by suing the company. He did not sue Kigler, who committed the assault upon him, but his wounded feelings and bruised person were easily healed and the wrong fully mitigated by the wonderful restorative—a verdict against the railroad company.

*Sillers & Owen,* for appellee.

Under the state of facts shown the assault by appellant's conductor was outrageous in the extreme, and merited the punishment inflicted by the jury.

Shelby wasn't a passenger under the circumstances; he had a right to enter on the steps of the ladder of this car, if it was necessary, as he shows it was, in order to ask the conductor's permission to go down on the train to the aid of his mother, who was a passenger in the wreck of one of the appellant's trains. If this is true, the verdict of the jury and judgment of the court are legal and proper, and will be allowed to stand, unless the conductor can show a justification. Does he do this? Shelby is a reliable, honorable man, was for years a deputy clerk of the chancery court, and was for four years sheriff of this county. He says that when he asked Conducter Kigler if he could go down to the wreck, he, Kigler, in an abrupt, discourteous manner said, "No you can't go; get down from there." Thinking the conductor thought he was an idler, and wanted to go to the wreck for mere curiosity he told him "it was not from foolishness or idle curiosity," that led him to make the request but that his mother was in the wreck and that he wanted to go to her assistance, whereupon, the conductor replied "I don't give a damn what you want to go for; get down from there," or as the witness Gibbons testified, the conductor replied, "No, get down, God damn you." Now did Shelby's reply justify the assault made on him by the conductor? Shelby's reply was "You need not be so damned insulting about it." A rather mild-mannered reply for a high-class man, as Shelby is, to such a gross insult, or, in fact, for any other sort of man; certainly considering the

anxious state of Shelby's mind on account of the probable danger of his mother, and the disappointing and painful effect the refusal of the conductor to allow him to go on the train to his mother's aid, had on his mind, coupled with the insulting demeanor and action of the conductor, a very mild reply. This certainly did not justify the assault and beating of Shelby in the face and on the head until he was knocked off the train. The action of this conductor rendered the appellant liable for punitive damages.

Parties going to the depot to receive coming friends or to accompany departing friends are there by right, and not as licenses. Note to *Dowd v. Chicago, etc., R. Co.,* 20 L. R. A. (1st ed.) 528; *McKine v. M. C. R. Co.,* 47 Am. Rep. 596; *Hamilton v. T. P. R. Co.,* 53 Am. Rep. 756.

In *Railroad v. Livingston,* 84 Miss. 1, it is held that a railroad company is liable for the misconduct of a conductor of one of its freight trains, which did not carry passengers, if he cursed and abused a trespasser on ejecting him from his train.

Shelby could hardly be said to be a trespasser. He had a right to be at the depot, and he surely under the circumstances had a right to ask the conductor to allow him to ride down to the wreck to the aid of his mother, as the train was about to pull out, had a right to climb upon the ladder or steps of the coal car, if it was necessary to do so, in order to see the conductor, and Shelby's undisputed evidence shows it was. He went to the conductor on the suggestion of the man on the engine. He was never at any time in the attitude of wilful trespasser. While he did not jump off the train at the abrupt order of the conductor but remained in order to explain that his sick mother was in the wreck still his remaining in that short interval for that purpose does not make him a trespasser.

WHITFIELD, C. J., delivered the opinion of the court.

The learned counsel for the appellant have presented in their very able brief its cause as skillfully as it is possible for it to

have been presented. They do not, however, give full force to the testimony of the plaintiff, and of the negro Tandy Gibbons. According to the testimony of the plaintiff, the conductor said to him: "I don't give a damn what you want to go for. Get off of there"—before the plaintiff concluded to get down, and made his counter observation, which he calls "a passing shot," at the conductor. The negro Tandy Gibbons testified that the conductor said to the plaintiff, in response to his request, "No, get down, God damn you," before Shelby made his response. It is perfectly obvious that the jury accepted the testimony of these two witnesses and repudiated the testimony for the defense. According to this testimony of the plaintiff and the witness Gibbons that the insulting conduct of the conductor occurred before the plaintiff had decided to get down off the side of the car, it is evident that this conduct took place plainly whilst the conductor was engaged in and about the "master's business." The whole controversy turns upon that point, whether or not the conductor's insulting language and conduct, as testified to by the plaintiff and the witness Gibbons, took place whilst the conductor was engaged in and about the "master's business," and on this point the learned counsel for the appellant drew and secured from the court a series of instructions presenting their contention in every possible view, in the aptest and strongest language. These instructions for the defendant are Nos. 5, 6, 8, 9, 10, 13, and 14. We cannot conceive how the law of the case for the defendant could have been any more learnedly or accurately presented. The trouble with the case is that the jury accepted the testimony for the plaintiff, and we cannot say that the verdict is manifestly wrong.

Therefore the judgment is *affirmed.*